**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

SONYA BACOTE,
Plaintiff,

v.

SARGENT MANUFACTURING COMPANY,
Defendant.

CIVIL ACTION NO.
3:24-CV-01637-KAD

---

# PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT SARGENT MANUFACTURING CO.'S MOTION FOR SUMMARY JUDGMENT

## PRELIMINARY STATEMENT

Sonya Bacote worked for Sargent Manufacturing for approximately 42 years. (Pl.'s L.R. 56(a)(2) Stmt. ¶ 2.) For 17 of those years, Sargent accommodated her five-pound shoulder lifting restriction without incident. (Pl.'s L.R. 56(a)(2) Stmt. ¶ 74.) Then, beginning in April 2022, Sargent removed Ms. Bacote from the Parts Pack role she had long held, purportedly for "errors" that Ms. Bacote's sworn testimony establishes were either committed while she was absent from work for two weeks or physically impossible given the nature of the parts at issue. (Pl.'s L.R. 56(a)(2) Stmt. ¶¶ 76–78.)

When Ms. Bacote returned from FMLA leave on July 5, 2022, Sargent placed her into a "layout" position that had been announced to her coworkers a week before her return—without consulting her—and that she immediately objected to because of known overhead-reaching and lifting restrictions. (Pl.'s L.R. 56(a)(2) Stmt. ¶¶ 81, 82.) She was told, in substance, to "just do the job" and that layout was "the only job" available. (Pl.'s L.R. 56(a)(2) Stmt. ¶ 82.) Defendant's own Exhibit 10 documents that, three weeks later, Ms. Bacote was still complaining in writing that

"the boxes are still high," that her shoulders were in "[s]oo much pain," and that the situation constituted "harassment." (Pl.'s L.R. 56(a)(2) Stmt. ¶ 85.)

Crucially, even after box-height issues were eventually addressed, layout still required Ms. Bacote to lift "rails" weighing "between eight pounds to 20 pounds" on a repetitive basis—a demand she testified exceeded her restrictions. (Pl.'s L.R. 56(a)(2) Stmt. ¶¶ 88, 89.) Defendant's own Exhibit 14 confirms a "light work" restriction with frequent lifting limited to "up to 10 pounds." (Pl.'s L.R. 56(a)(2) Stmt. ¶ 90.) Whether the actual, repetitive rail-lifting demands of layout were within that restriction is a classic factual dispute that cannot be resolved on paper.

This record contains genuine disputes of material fact on every element Defendant targets: the legitimacy of the "errors" rationale for removing Ms. Bacote from Parts Pack; whether Sargent restored her to an equivalent position after FMLA leave; whether the accommodation process was timely, effective, or adequate; and whether the timing and conditions of the July 2022 assignment support inferences of retaliation and discriminatory motive. Summary judgment should be denied.

## STATEMENT OF FACTS

The following facts are drawn from the record, viewed as Rule 56 requires—in the light most favorable to Plaintiff.

### A. Ms. Bacote's Long Tenure and Accommodated Restrictions

Ms. Bacote has worked for Sargent for approximately 42 years. (Pl.'s L.R. 56(a)(2) Stmt. ¶ 2.) For years before July 2022, she had shoulder restrictions—including a five-pound lifting restriction—imposed by Dr. Daigneault, which Sargent had accommodated for approximately 17 years without incident. (Pl.'s L.R. 56(a)(2) Stmt. ¶ 74.)

**B. Removal from Parts Pack: April 2022**

In April 2022, Ms. Bacote was removed from her Parts Pack role. (Pl.'s L.R. 56(a)(2) Stmt. ¶ 75.) Defendant's Exhibit 7 contains a notation stating "April 21st 22" was the "Last Day for Sonya in Parts Pack" due to "Too many errors." (Pl.'s L.R. 56(a)(2) Stmt. ¶ 75.) That document, however, identifies neither specific errors nor supporting investigation.

Ms. Bacote's testimony directly challenges the factual basis for those purported errors. She testified that management cited a "special strike" packing mistake, which she disputed as physically impossible given how the part ships—and which she packed in front of supervisor Scott Ramon. (Pl.'s L.R. 56(a)(2) Stmt. ¶ 76.) Management also attributed to her "mistakes made when I wasn't there for two weeks." (Pl.'s L.R. 56(a)(2) Stmt. ¶ 77.) Ms. Bacote pressed management to consult scan timestamps showing who packed and when, but management "didn't want to hear it." (Pl.'s L.R. 56(a)(2) Stmt. ¶ 78.) She also asked that an existing camera be redirected toward the Parts Pack room to investigate what she perceived as tampering; management refused. (Pl.'s L.R. 56(a)(2) Stmt. ¶ 79.)

Ms. Bacote further testified that despite the asserted "mistakes," she received no "real warnings" or write-ups and obtained only one email when she specifically asked for documentation. (Pl.'s L.R. 56(a)(2) Stmt. ¶ 80.)

**C. Medical Leave: May–July 2022**

In May 2022, Ms. Bacote took FMLA leave. She testified she went out "after May" and was "out up until July 5." (Pl.'s L.R. 56(a)(2) Stmt. ¶ 41 (Response).) She received the leave she requested. (Pl.'s L.R. 56(a)(2) Stmt. ¶ 42 (Response).) But she also testified that upon returning to work she "came right back into this," re-triggering her symptoms. (Pl.'s L.R. 56(a)(2) Stmt. ¶ 95.)

**D. Return to Work: Placement into Layout, July 5, 2022**

Ms. Bacote returned from leave on July 5, 2022 and was placed into a "layout" position. (Pl.'s L.R. 56(a)(2) Stmt. ¶ 45 (Response).) She testified that approximately a week before her return, the assignment was announced to others without discussing it with her. She learned of it from material handler Ralph Streeto, who asked, "So what do you think of your new job?" (Pl.'s L.R. 56(a)(2) Stmt. ¶ 81.)

Ms. Bacote objected because of her known restrictions. In a hallway conversation, union steward Chris Florentine told her to "Just do the job," while manager Jeff Granath stated, "That's the only job we have" and "If you can't do it, I don't have anything for you." Ms. Bacote reminded them she had restrictions and could not "reach over my head" or "lift anything heavy." (Pl.'s L.R. 56(a)(2) Stmt. ¶ 82.)

Layout required constant standing—Ms. Bacote testified she was "on your feet all the time" and could not sit "as needed" while keeping an inspector supplied. (Pl.'s L.R. 56(a)(2) Stmt. ¶ 83.) She also testified that "there was no women that stayed on that job more than two hours," that layout positions were "all men," and women only "fill[ed] in" temporarily, while she was assigned on a full-time, regular basis. (Pl.'s L.R. 56(a)(2) Stmt. ¶ 84.)

**E. Overhead Storage, Box-Height Complaints, and the "Accommodation"**

Defendant's Exhibit 10 includes Ms. Bacote's July 25, 2022 email stating the "boxes are still high," that "Jeffery put me right back on the job without any change," that her shoulders were in significant pain, and demanding the "boxes MUST be lowered." She characterized the situation as "harassment" and "putting my health in harm's way." (Pl.'s L.R. 56(a)(2) Stmt. ¶ 85.)

The same exhibit shows HR's response: Ms. Bacote would not pick up anything higher than three feet and should "notify Jeff" for reassignment of higher-stored items. (Pl.'s L.R. 56(a)(2)

Stmt. ¶ 54 (Response).) A jury could reasonably view that arrangement as placing the operational burden on Ms. Bacote to self-police each assignment and seek ad hoc task reallocation during active workflow.

Ms. Bacote testified that boxes were stacked above reach and that she used a rod to try to obtain them until her union told her to stop for safety reasons; she questioned how she was supposed to retrieve boxes without overhead reaching. (Pl.'s L.R. 56(a)(2) Stmt. ¶ 86.) Boxes were eventually lowered only after a medical visit and communications involving HR. Management reacted with visible frustration—"huffing and puffing"—though the change made the job "easier." (Pl.'s L.R. 56(a)(2) Stmt. ¶ 87.)

**F. The Rail-Lifting Problem: An Unresolved Accommodation Failure**

Even after box heights were addressed, Ms. Bacote testified she was "still lifting the rails," which she described as "over five pounds" and "a whole different issue." (Pl.'s L.R. 56(a)(2) Stmt. ¶ 88.) She acknowledged an August 2022 work note reflected a 10-pound lifting restriction rather than five pounds. (Pl.'s L.R. 56(a)(2) Stmt. ¶ 90.) But she testified rails could weigh "between eight pounds to 20 pounds" depending on components, and she emphasized the repetitiveness: eight pounds "times eight" on an eight-piece order, "back-to-back." (Pl.'s L.R. 56(a)(2) Stmt. ¶ 89.)

Defendant's Exhibit 14—a Connecticut Orthopaedics Work Status Report dated August 22, 2022—marked Ms. Bacote for "light work" with frequent lifting/carrying "up to 10 pounds," and includes handwritten restrictions concerning overhead/shoulder use. (Pl.'s L.R. 56(a)(2) Stmt. ¶ 90.) Whether repetitive lifting of eight-to-twenty-pound rails on continuous orders falls within that restriction is precisely the kind of fact-intensive question that summary judgment cannot resolve.

**G. Flat Trim Request and Overtime Exclusion**

Ms. Bacote testified she asked to be assigned to "flat trim." Jeff Granath responded "We'll see" and never gave a definitive answer. Scott Ramon said it "depend[ed]" on Jeff. (Pl.'s L.R. 56(a)(2) Stmt. ¶ 91.) She also testified that she had previously been temporarily assigned to run flat trim while also doing layout, and that management asked her to train another employee who was placed into flat trim after Linda Bird left. (Pl.'s L.R. 56(a)(2) Stmt. ¶ 92.)

Regarding overtime, Ms. Bacote testified she could sometimes work overtime in layout, but when the overtime involved non-layout work (e.g., building up other lines), she was "excluded" and "they wouldn't let me work" elsewhere, even though she believed she could handle other tasks. (Pl.'s L.R. 56(a)(2) Stmt. ¶ 94.)

**H. April 2023 Leave and Subsequent Inability to Work**

In April 2023, Ms. Bacote went on leave for a rotator cuff injury and has been out since. (Pl.'s L.R. 56(a)(2) Stmt. ¶ 62 (Response).) She testified there was no work she could do at Sargent between going out in April 2023 and her August/September 2023 surgery. (Pl.'s L.R. 56(a)(2) Stmt. ¶ 64 (Response).)

## LEGAL STANDARD

Plaintiff accepts Defendant's recitation of the governing standards for the ADA failure-to-accommodate and disability discrimination claims (Counts One and Two), FMLA retaliation and interference (Counts Five and Six), CTFMLA, and IIED/workers' compensation exclusivity. (Def. MSJ Mem. pp. 11–35.) The opposition focuses on the dispositive Rule 56 question: whether Defendant has established the absence of genuine disputes on material facts underlying each element as Defendant frames them.

Plaintiff does, however, dispute Defendant's statute of limitations arguments as to the FMLA claims (Counts Five and Six) on both willfulness and continuing-violation grounds, as set forth below. Plaintiff acknowledges that the CTFMLA claim (Count Four) faces a substantial timeliness obstacle under the 180-day limitations period.

## ARGUMENT

### I. Genuine Disputes of Material Fact Preclude Summary Judgment on ADA Failure to Accommodate (Count Two)

Defendant contends that Sargent provided accommodations and that Plaintiff cannot identify a reasonable accommodation that was denied. (Def. MSJ Mem. pp. 11–14.) The record contradicts that characterization.

**Communication of Restrictions and Sargent's Response.** Ms. Bacote repeatedly communicated her restrictions and objections to layout. She had long-standing shoulder restrictions that Sargent accommodated for 17 years. (Pl.'s L.R. 56(a)(2) Stmt. ¶ 74.) Upon her return from leave, she was told to "just do the job" and that layout was "the only job" available, even though she reminded management she had restrictions and could not reach overhead or lift "anything heavy." (Pl.'s L.R. 56(a)(2) Stmt. ¶ 82.)

**The Box-Height "Accommodation" Was Neither Timely Nor Effective.** Defendant's own Exhibit 10 demonstrates that in late July 2022 the problem remained unresolved: Ms. Bacote wrote that "the boxes are still high," demanded they "MUST be lowered," and described the situation as "harassment." (Pl.'s L.R. 56(a)(2) Stmt. ¶ 85.) HR's response placed the operational burden on Ms. Bacote to notify a manager for reassignment whenever items were stored above three feet—during active workflow where she was responsible for continuously supplying an

inspector. (Pl.'s L.R. 56(a)(2) Stmt. ¶¶ 54 (Response), 83.) A jury could readily find this arrangement was not a reasonable accommodation but an instruction to endure the problem.

**Rail Lifting: An Independently Dispositive Dispute.** Even after box height was addressed, Ms. Bacote testified she was "still lifting the rails"—"a whole different issue." (Pl.'s L.R. 56(a)(2) Stmt. ¶ 88.) Rails weighed "between eight pounds to 20 pounds" and the lifting was repetitive: eight pounds "times eight" on a single order, "back-to-back." (Pl.'s L.R. 56(a)(2) Stmt. ¶ 89.) Defendant's own Exhibit 14 restricts "frequent lifting" to "up to 10 pounds." (Pl.'s L.R. 56(a)(2) Stmt. ¶ 90.) Whether repetitive lifting of rails weighing up to 20 pounds falls within that restriction is a textbook factual dispute for the jury.

**Reassignment to Flat Trim Was Requested and Never Resolved.** Ms. Bacote testified she sought reassignment to flat trim. Jeff Granath responded "We'll see" and never answered yes or no. Scott Ramon said it depended on Jeff. (Pl.'s L.R. 56(a)(2) Stmt. ¶ 91.) She had previously been temporarily assigned to run flat trim and was asked to train the employee who replaced her there. (Pl.'s L.R. 56(a)(2) Stmt. ¶ 92.) Under Defendant's own framework acknowledging reassignment as a potential accommodation, whether flat trim was a feasible alternative cannot be resolved against Plaintiff where vacancy and job-demand evidence remains within Defendant's control.

These disputes—individually and cumulatively—require denial of summary judgment on the failure-to-accommodate claim as it relates to the July 2022 placement and the adequacy of accommodations for overhead and lifting restrictions.

**Defendant's Reliance on Employer Discretion Is Misplaced**. Defendant invokes *Noll v. IBM*, 787 F.3d 89, 95 (2d Cir. 2015), for the proposition that employers need not provide the employee's preferred accommodation. (Def. MSJ Mem. p. 13.) But *Noll* presupposes that the

employer has provided an "effective" accommodation. *Id*. An accommodation that leaves the employee performing work outside her documented restrictions is not "effective" within the meaning of the ADA–and the question of effectiveness is precisely what is disputed here. Defendant's own Exhibit 14 restricts frequent lifting to "up to 10 pounds." (Pl.'s L.R. 56(a)(2) Stmt. ¶ 90.) Whether repetitive lifting of rails weighing up to 20 pounds on continuous, back-to-back orders falls within that restriction is a factual dispute–not a matter of employer discretion. Moreover, flat trim was not merely a "preference"; it was a requested alternative assignment that Plaintiff had previously performed and for which she trained another employee. (Pl.'s L.R. 56(a)(2) Stmt. ¶¶ 91, 92.) Under the ADA's interactive process requirement, Sargent was obligated to give good-faith consideration to that request. Jeff Granath's response–"We'll see" followed by silence–does not satisfy that obligation.

**Defendant's Deposition Excerpt Does Not Resolve the Rail-Lifting Dispute**. Defendant quotes Plaintiff's deposition testimony at length to suggest she conceded that rail lifting fell within her restrictions. (Def. MSJ Mem. pp. 12–13.) But that excerpt, read in context, does not eliminate the dispute. Plaintiff's response–"According to what he says"–is equivocal; it acknowledges the doctor's note on paper without conceding that the actual, repetitive demands of layout complied with it. More fundamentally, the 10-pound restriction applies to "frequent lifting or carrying objects up to ten pounds." (Pl.'s L.R. 56(a)(2) Stmt. ¶ 90.) Plaintiff testified that rails weighed "between eight pounds to 20 pounds" depending on components–meaning some rails exceeded the 10-pound limit entirely–and that the lifting was repetitive: "eight pounds times eight" on a single order, "back-to-back." (Pl.'s L.R. 56(a)(2) Stmt. ¶ 89.) Whether sustained, repetitive lifting at or above the restriction's boundary constitutes work "within" medical restrictions is a credibility determination and factual inference reserved for the jury.

## II. Genuine Disputes of Material Fact Preclude Summary Judgment on ADA Disability Discrimination (Count One)

Defendant argues Plaintiff cannot show an adverse employment action or pretext. (Def. MSJ Mem. pp. 28–31.) The record supports both.

As an initial matter, Defendant suggests that Plaintiff's discrimination claim is "more properly analyzed as a failure to accommodate claim." (Def. MSJ Mem. p. 29.) That argument conflates distinct statutory theories. A failure-to-accommodate claim addresses whether the employer provided reasonable accommodations; a discrimination claim addresses whether the employer took adverse action because of disability. The same facts may support both theories, and Plaintiff is entitled to pursue each independently.

Under the Supreme Court's recent decision in *Muldrow v. City of St. Louis*, 601 U.S. 346, 354 (2024), an adverse employment action need only cause "some harm respecting an identifiable term or condition of employment." The Court expressly rejected a "significance" threshold. *Id*. at 355. Here, the harm is neither de minimis nor speculative: layout required constant standing, overhead retrieval, and repetitive heavy rail lifting that conflicted with documented medical restrictions–causing physical pain documented contemporaneously in Defendant's own exhibit. (Pl.'s L.R. 56(a)(2) Stmt. ¶ 85.) That easily satisfies *Muldrow*'s "some harm" standard.

**Adverse Action.** Removal from Parts Pack and assignment to layout are not "mere inconveniences." Layout required constant standing; Ms. Bacote could not sit "as needed." (Pl.'s L.R. 56(a)(2) Stmt. ¶ 83.) She was moved into layout despite known overhead and lifting limitations and while layout tasks involved high box retrieval and heavy rail lifting. (Pl.'s L.R. 56(a)(2) Stmt. ¶¶ 83, 86, 88, 89.) Defendant's Exhibit 10 contains Ms. Bacote's contemporaneous statement that she was put "right back on the job without any change," was in pain, and perceived

"harassment." (Pl.'s L.R. 56(a)(2) Stmt. ¶ 85.) These are measurable harms to working conditions and physical safety—not merely "unpleasant workplace events."

**Pretext.** Defendant's performance-based justification for removing Ms. Bacote from Parts Pack is materially contested. She testified the "special strike" error was physically impossible as described. (Pl.'s L.R. 56(a)(2) Stmt. ¶ 76.) Management blamed her for mistakes made during a two-week absence and refused to consult scan timestamps that would have resolved the question. (Pl.'s L.R. 56(a)(2) Stmt. ¶¶ 77, 78.) She requested camera redirection to investigate potential tampering; management refused. (Pl.'s L.R. 56(a)(2) Stmt. ¶ 79.) And despite these purported "mistakes," there were no formal warnings or write-ups. (Pl.'s L.R. 56(a)(2) Stmt. ¶ 80.) That combination is sufficient for a jury to question whether the proffered justification was fully investigated, accurate, or genuine.

**Discriminatory Motive.** Ms. Bacote testified layout positions were "all men" and women did not regularly stay on the job. (Pl.'s L.R. 56(a)(2) Stmt. ¶ 84.) The timing and process of the July 2022 placement further support an inference of discriminatory motive: the assignment was announced a week before her return from leave, without consulting her, and she learned of it from a coworker. (Pl.'s L.R. 56(a)(2) Stmt. ¶ 81.) A jury could reasonably find this reflects a foregone decision disconnected from any individualized accommodation assessment.

**Defendant's Remaining Arguments Do Not Warrant Summary Judgment**. Defendant contends that Plaintiff's replacement in parts pack had a disability, citing the Bobinski Declaration. (Def. MSJ Mem. p. 30.) But Plaintiff lacks information about the nature, severity, or comparability of that individual's restrictions. (Pl.'s L.R. 56(a)(2) Stmt. ¶ 44 (Response).) A conclusory declaration that the replacement "has a disability and/or has medical restrictions" does not establish that the replacement's situation was comparable to Plaintiff's, and the disjunctive "and/or"

formulation underscores the vagueness. Moreover, the replacement's protected status does not negate the inference arising from the timing, process, and circumstances of Plaintiff's removal and reassignment.

Defendant also cites the CHRO investigator's draft no-reasonable-cause finding. (Def. MSJ Mem. p. 25; Def. Ex. 3.) A CHRO determination is not binding on this Court and carries no preclusive effect. Moreover, the CHRO investigator did not have the benefit of the full evidentiary record developed through discovery, including Plaintiff's detailed deposition testimony concerning the rail-lifting issue, the uninvestigated errors, and the circumstances of the pre-announced layout assignment.

## III. Genuine Disputes Preclude Summary Judgment on FMLA Interference (Count Six)

Defendant argues Count Six fails because Ms. Bacote received all leave and was restored to an equivalent position. (Def. MSJ Mem. pp. 32–34.)

As a threshold matter, Defendant contends Count Six is barred by the two-year statute of limitations. (Def. MSJ Mem. pp. 31–32.) This argument fails for two reasons. First, Defendant's alleged interference was not a single discrete act on July 5, 2022; it was a continuing course of conduct. The failure to restore Plaintiff to an equivalent position persisted throughout the period she remained in layout—from July 2022 through April 2023—as the accommodation failures (unresolved rail lifting, overhead retrieval, overtime exclusion) continued on an ongoing basis. Acts occurring after September 18, 2022 fall within the two-year limitations period. Second, even as to the initial July 5, 2022 placement, the three-year limitations period applies because the record supports a finding of willfulness. Sargent pre-announced the layout assignment while Plaintiff was still on FMLA leave, without consulting her, and told her upon return that it was "the only job"

available—reflecting, at minimum, reckless disregard of Plaintiff's FMLA restoration rights. See 29 U.S.C. § 2617(c)(2).

The record supports a triable dispute as to equivalence. Ms. Bacote expected to return to "screw pack" but learned she would be "doing Wayne's job" (layout). (Pl.'s L.R. 56(a)(2) Stmt. ¶ 93.) Defendant contends layout was equivalent because she remained in the same labor grade with the same pay and benefits. (Def. MSJ Mem. p. 33.) But Defendant's own recited standard of "equivalent position" includes substantially similar "duties" and "effort." The record contains disputes about whether layout involved materially greater physical effort for Ms. Bacote: constant standing, overhead retrieval, and repetitive heavy rail lifting—all in conflict with known medical restrictions. (Pl.'s L.R. 56(a)(2) Stmt. ¶¶ 83, 86, 88, 89.)

A reasonable jury could find that being required to perform duties conflicting with known medical restrictions—where the employee contemporaneously complained of shoulder pain and "harassment"—renders the position not "equivalent" in any meaningful sense, regardless of job title or grade. (Pl.'s L.R. 56(a)(2) Stmt. ¶¶ 82, 85.)

Further, Ms. Bacote testified she was excluded from certain overtime opportunities when the work was outside layout. (Pl.'s L.R. 56(a)(2) Stmt. ¶ 94.) A jury could find that exclusion measurable in hours and pay—not "de minimis."

Defendant's invocation of the de minimis exception, 29 C.F.R. § 825.215(f), is unavailing. That exception applies to "intangible[] or unmeasurable aspects of the job." Id. The differences here–constant standing versus ability to sit as needed, overhead retrieval, repetitive heavy lifting conflicting with documented restrictions, and exclusion from overtime opportunities–are neither intangible nor unmeasurable. They are physical demands with documented medical consequences.

## IV. Genuine Disputes Preclude Summary Judgment on FMLA Retaliation (Count Five)

Defendant argues Plaintiff cannot establish adverse action or pretext beyond temporal proximity. (Def. MSJ Mem. pp. 22–28.) The record provides substantially more.

As a threshold matter, Defendant argues Count Five is time-barred because Plaintiff commenced this action more than two years after the July 5, 2022 placement. (Def. MSJ Mem. pp. 22–23.) The three-year limitations period applies because the evidence supports a finding of willfulness. 29 U.S.C. § 2617(c)(2). Here, the record shows: (1) Sargent pre-announced the layout assignment to coworkers while Plaintiff was still on FMLA leave, without consulting her (Pl.'s L.R. 56(a)(2) Stmt. ¶ 81); (2) upon Plaintiff's return, management told her to "just do the job" and that layout was "the only job" available, despite longstanding knowledge of her restrictions (id. ¶ 82); and (3) Plaintiff was placed into a role involving overhead retrieval and heavy rail lifting that conflicted with her documented restrictions (*id*. ¶¶ 85–90). A jury could find these actions reflect, at minimum, reckless disregard for whether the July 2022 placement violated Plaintiff's FMLA restoration rights. Defendant's reliance on its history of granting FMLA leave does not negate willfulness as to the distinct question of restoration to an equivalent position.

Moreover, the retaliatory conduct was not limited to the July 5, 2022 placement. The ongoing accommodation failures–the unresolved rail-lifting issue, overtime exclusion, and the unresolved flat trim request–continued through at least April 2023, well within the two-year limitations period regardless of the willfulness question.

Ms. Bacote took leave beginning in May 2022 and returned July 5, 2022. (Pl.'s L.R. 56(a)(2) Stmt. ¶¶ 41, 45 (Responses).) She was placed into layout. (Pl.'s L.R. 56(a)(2) Stmt. ¶ 93.) The decision was announced about a week before her return—while she was still on leave—

without consulting her. (Pl.'s L.R. 56(a)(2) Stmt. ¶ 81.) She objected based on restrictions but was told it was the only available job. (Pl.'s L.R. 56(a)(2) Stmt. ¶ 82.) Layout entailed overhead retrieval issues, constant standing, and heavy rail lifting, and the record contains her contemporaneous complaint about pain, lack of change, and "harassment." (Pl.'s L.R. 56(a)(2) Stmt. ¶¶ 83, 85, 88.)

These facts are more than bare temporal proximity. They constitute evidence of a pre-announced assignment without consultation, immediate placement into a role conflicting with known restrictions, and contemporaneous documentation reflecting pain and perceived harassment. Whether this would "dissuade a reasonable worker" is a fact-intensive question that cannot be resolved on summary judgment where the core working-condition facts are disputed.

To the extent Defendant relies on Ms. Bacote's testimony that she does not believe Sargent "intentionally" removed overtime opportunities because of disability (Pl.'s L.R. 56(a)(2) Stmt. ¶ 56 (Response)), that testimony does not eliminate the factual dispute that she experienced exclusion from overtime after being placed into layout (Pl.'s L.R. 56(a)(2) Stmt. ¶ 94), nor does it defeat retaliation causation where placement occurred immediately upon return from leave.

## V. Post-April 2023 Inability to Work May Narrow Certain Claims but Does Not Eliminate July 2022–April 2023 Disputes

Ms. Bacote testified she has been on leave since April 2023 and there was no work she could perform between going out and her surgery. (Pl.'s L.R. 56(a)(2) Stmt. ¶¶ 62, 64 (Responses).) That testimony may narrow or eliminate any claim premised solely on a refusal to bring her back during a period of total disability.

But it does not extinguish the triable disputes concerning the July 2022 restoration placement, the effectiveness of accommodations during the period she continued working, and

whether workplace conditions contributed to injury or worsening while she remained employed through April 2023. (Pl.'s L.R. 56(a)(2) Stmt. ¶¶ 83, 88, 89.)

**VI. CTFMLA (Count Four)**

Defendant argues Count Four is barred by the CTFMLA's 180-day statute of limitations. (Def. MSJ Mem. pp. 20–21.) Plaintiff acknowledges that the 180-day limitations period set forth in Conn. Agency Reg. § 31-51qq-43(a) presents a substantial obstacle to this claim. Plaintiff commenced this action on September 18, 2024–more than two years after the July 5, 2022 placement. Accordingly, Plaintiff does not oppose summary judgment on Count Four to the extent it is premised on the timeliness defense. Plaintiff notes, however, that the identical substantive conduct supporting the CTFMLA claim is fully preserved through the FMLA interference and retaliation claims (Counts Five and Six), which are subject to different and more favorable limitations periods as argued above.

**VII. Intentional Infliction of Emotional Distress (Count Three)**

Defendant seeks summary judgment on Count Three on three grounds: workers' compensation exclusivity, failure to establish extreme or outrageous conduct, and failure to show severe emotional distress. (Def. MSJ Mem. pp. 14–19.)

***Workers' Compensation Exclusivity.*** Defendant argues that Plaintiff's IIED claim is barred by the exclusivity provision of Connecticut's Workers' Compensation Act, Conn. Gen. Stat. § 31-284(a). (Def. MSJ Mem. pp. 14–16.) To the extent Plaintiff's Complaint premises emotional distress on the physical shoulder re-injury sustained in April 2023, Plaintiff acknowledges the exclusivity provision presents a significant barrier. However, not all of Plaintiff's alleged emotional distress arises from a compensable physical injury. Plaintiff's testimony identifies distinct sources of distress–"constant nitpicking from management" and being accused of stealing

(Pl.'s L.R. 56(a)(2) Stmt. ¶ 70 (Response))–that are independent of any physical workplace injury and thus fall outside the exclusivity provision. *See Perodeau v. City of Hartford*, 259 Conn. 729, 745 (2002) (workers' compensation exclusivity does not bar claims for emotional injuries that are independent of any compensable physical injury).

***Extreme and Outrageous Conduct.*** Defendant argues that its conduct does not meet the "extreme and outrageous" standard. (Def. MSJ Mem. pp. 16–18.) Plaintiff recognizes that Connecticut courts set a high bar for this element. In candor, the strength of this claim is narrower than the ADA and FMLA claims. Nevertheless, the record contains evidence from which a reasonable factfinder could conclude that the cumulative course of conduct–removing Plaintiff from her role based on uninvestigated errors, pre-announcing a physically demanding replacement assignment during FMLA leave without consultation, responding to her complaints about pain with "huffing and puffing," accusing her of stealing, and persistent "nitpicking"–exceeds mere insensitivity and amounts to a pattern of deliberate disregard for an employee's well-documented medical vulnerabilities. Whether this record crosses the line into "extreme and outrageous" is a determination on which reasonable minds may disagree, making it properly reserved for the jury.

***Causation and Severity.*** Defendant argues that Plaintiff's pre-existing anxiety and depression diagnoses defeat the causation element. (Def. MSJ Mem. p. 19.) But a pre-existing condition does not immunize an employer from liability for exacerbation. Defendant's own Exhibit 10 documents Plaintiff's contemporaneous complaints of "harassment" and being placed in "harm's way" (Pl.'s L.R. 56(a)(2) Stmt. ¶ 85), and the record reflects multiple distinct sources of distress beyond any physical injury. Whether workplace conditions worsened Plaintiff's pre-existing symptoms is a factual question for the jury.

## CONCLUSION

The record contains genuine disputes of material fact on every element Defendant targets. The legitimacy of the "errors" rationale is contested by Ms. Bacote's testimony that the alleged errors were impossible, occurred during her absence, and went uninvestigated despite available scan data. The equivalence of the layout position is contested by testimony about constant standing, overhead retrieval, and repetitive heavy rail lifting that exceeded documented medical restrictions. The adequacy of Sargent's accommodation process is contested by Defendant's own Exhibit 10 showing unresolved complaints and an operational burden placed on the employee. And the timing and circumstances of the July 2022 placement support reasonable inferences of retaliation and discriminatory motive.

Summary judgment should be denied as to Counts One, Two, Five, and Six, all of which are premised on the July 2022 return-to-work placement and accommodation failures, and as to which genuine disputes of material fact preclude judgment as a matter of law. Plaintiff does not oppose summary judgment on Count Four (CTFMLA) on timeliness grounds, as the substantive conduct is fully preserved through the FMLA claims. As to Count Three (IIED), Plaintiff has identified record evidence supporting each element, though Plaintiff acknowledges the claim's narrower scope relative to the ADA and FMLA claims. To the extent Defendant seeks judgment based solely on post-April 2023 inability-to-work facts, the record may support partial narrowing—but it does not extinguish the triable disputes arising from the period July 2022 through April 2023.

Respectfully submitted,

**SONYA BACOTE**

By: _/s/________________________

Alexander T. Taubes, Esq.
TAUBES LAW
470 James Street, Suite 007
New Haven, Connecticut 06513
(203) 909-0048